105 P.3d 1037 (2005)
STATE of Washington, Respondent,
v.
Jamie Lloyd WALLIN, Appellant.
No. 52920-0-I.
Court of Appeals of Washington, Division 1.
February 7, 2005.
*1038 Gregory C. Link, Washington Appellate Project, Seattle, WA, for Appellant.
Seth A. Fine, Snohomish Co. Prosecutor, Everett, WA, for Respondent.
COX, C.J.
At issue in this appeal is whether a warrantless search by Department of Corrections (DOC) officers of the home of Jamie Wallin was done "without authority of law" as prohibited by article 1, section 7 of the Washington Constitution. We are constrained to hold that the search was without authority of law and thus violates the state constitution. The evidence obtained by virtue of the search must be suppressed. Accordingly, we reverse.
In 1994, Jamie Wallin pleaded guilty to one count of first degree child molestation and the court sentenced him under a Special Sex Offender Sentencing Alternative (SSOSA). The charging period for the crime was July 2, 1988 to January 8, 1990. The SSOSA was subsequently revoked in March 1996, and Wallin was ordered to serve a 51 month sentence with one year of community placement upon release. Wallin was released from prison on April 29, 1998. On March 22, 1999, Wallin violated his community placement by repeatedly asking out a 16 year old girl who worked at a local espresso stand. Wallin frequented the establishment, lingering to chat with the girl, and bringing her cards and gifts. One condition of his community placement required that Wallin have no contact with minors without the approval of his CCO, or without the presence of an approved adult. As a result, the court modified Wallin's sentence, imposing 60 days of confinement and extending the period of community placement to ten years, the statutory maximum for his crime.[1]
All parties present at these proceedings apparently believed the court had the power to extend Wallin's community placement under former RCW 9.94A.120(10)(c). During the hearing, the DOC officer recommended that the court extend the order prohibiting contact with the victim. The DOC officer said "[M]y primary emphasis here is on no contact with [the victim]. [U]nder the law the court can extend the time past the active supervision period that no contact can occur ..." The defense requested that the court impose time served for the violation or, in the *1039 alternative, that Wallin be granted work release. Neither the prosecuting attorney nor the DOC officer objected to those terms. In that context, the defense attorney noted "[we] have no objection to extending supervision or the jurisdiction and certainly no objection to having no contact whatsoever with [the victim] or her family ..." Ultimately, the court denied work release, imposing 60 days of confinement, a no contact with the victim order, and extending community supervision "for the maximum statutory period."
In March 2003, a neighbor telephoned the police to complain that Wallin had been taking pictures of her teenage nieces from his apartment window. The police spoke with Wallin, who denied taking photographs and showed the officers his blank digital camera. The police reported the incident to Wallin's CCO, who felt that, given his history, the incident was a strong indication that Wallin was violating the terms of his community placement. As a result, several CCOs visited Wallin and searched his home and computer. The CCOs did not have a warrant. After finding large numbers of images on Wallin's computer which appeared to be minors in sexually suggestive poses and activities, the officers contacted the Marysville police and arrested Wallin. Relying on information obtained from the CCOs, police officers obtained a warrant to search the home, computer, and media storage devices.
Officers discovered thousands of images portraying minors in sexually suggestive poses or activities in the computer. Among these were a number of homemade photographs which were identified as having been taken with a Sony Cyber Shot camera. A detective recalled seeing such a camera in Wallin's home when the search warrant was executed.
A second warrant was obtained to search for and seize the camera. But family members had removed it, along with other valuable items, from the apartment for safekeeping. Police spoke with Wallin's grandparents who did not have the camera, but who took the officer's contact information. A few hours later, Wallin's father contacted the police and volunteered to turn over the camera he had removed from the apartment.
Police discovered a number of additional photographs on the camera's memory stick, including the homemade images discovered on the computer. The homemade images included photographs of an adult male's penis next to or penetrating the vagina of a minor female.
After the discovery of these photos, police interviewed Wallin about them. Wallin eventually admitted that he was the adult male in the photographs. He also admitted to having sexual contact with the nine year girl in the photos, whom he identified.
The State charged Wallin with first degree rape of a child, first degree child molestation, sexual exploitation of a minor, and possession of depictions of a minor engaged in sexually explicit conduct. Wallin moved to suppress the fruits of the corrections officers' initial search of his apartment, including the computer, the camera, and his statement. Wallin argued that the 1999 order was invalid because the statute permitting extension of community placement only applied to offenses committed after July 1996, and did not apply to his offense. Thus, he contended, the CCOs lacked authority to conduct a warrantless search of his apartment.
The trial judge denied the motion, concluding the 1999 order was facially valid and the corrections officers were entitled to rely on it. Following a stipulated bench trial, the court found Wallin guilty as charged. The court sentenced Wallin to life without the possibility of parole, finding that because of his 1994 conviction, the current convictions qualified him as a persistent offender.
Wallin appeals.

AUTHORITY OF LAW
Wallin argues that the evidence used to convict him was obtained in violation of the federal and state constitutions and should have been suppressed at trial. Specifically, Wallin contends that the order extending his community supervision beyond the statutory period was invalid on its face, providing no legal authority for the initial warrantless search and, as such, the officers were not *1040 entitled to rely upon it. We hold that the order did not provide authority of law for the warrantless search.
"A search must be conducted pursuant to a warrant, or else meet one of the exceptions to the warrant requirement."[2] As a general rule, our state constitution provides greater protection than does the federal constitution against warrantless searches and seizures.[3] Therefore, our analysis begins with article 1, section 7 of the state constitution.
The State has the burden to show that a warrantless search falls into one of the narrow exceptions to the warrant requirement.[4] This court reviews de novo conclusions of law from an order pertaining to the suppression of evidence.[5]
There is no dispute that the DOC officers who conducted the initial search of Wallin's home did so without a warrant. Moreover, the State does not dispute the trial court's findings that the computer, camera, photographic images and Wallin's subsequent confession were fruits of the initial warrantless search.

"Private Affairs"
Article I, section 7 of the Washington State Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." The provision has two main components: "private affairs" and "authority of law."[6] A disturbance of a person's private affairs usually occurs when the government intrudes upon "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from government trespass."[7] Determining a constitutional violation turns on whether the State has unreasonably intruded into a person's "private affairs."[8] "Thus, the first step is to determine whether the claimed privacy interest is one that has been recognized in our state."[9] Both parties agree that a probationer has a lessened expectation of privacy and may be searched on the basis of a "well-founded suspicion" or a "reasonable suspicion" of a parole violation.[10]
Wallin's status at the time of the search is crucial to analyzing the reasonableness of the CCO search under the circumstances. Wallin argues that since his community placement had actually expired in 1999, he was no longer a probationer at the time of the CCO search. Therefore, the lower standard of "reasonable suspicion" did not apply. Consequently, the legality of the search is dependent on the validity of the 1999 order extending Wallin's community placement.
Wallin argues that the 1999 order was invalid on its face and, as such, it could not bestow authority for the search. The State maintains, however, that the CCO search of Wallin's home was lawful because the 1999 order provided the "authority of law" required by the Washington State Constitution. According to the State, the DOC officers had not only the duty, but the obligation to enforce *1041 the order until it was modified by a court.
At the time the trial court extended Wallin's community placement in March 1999, for "the maximum statutory period," no legal authority granted it the power to do so. The statute in effect at the time, former RCW 9.94A.120(10)(a), provided for the imposition of community custody for a "sex offense committed on or after June 6, 1996."[11] Former RCW 9.94A.120(10)(c) read, in relevant part:
At any time prior to the completion of a sex offender's term of community custody, if the court finds that public safety would be enhanced, the court may impose and enforce an order extending any or all of the conditions imposed pursuant to this section for a period up to the maximum allowable sentence for the crime as it is classified in chapter 9A.20 RCW, regardless of the expiration of the offender's term of community custody.[[12]]
The authority to so extend community placement terms did not apply to offenses committed prior to 1996. According to former RCW 9.94A.120(9)(a), "[w]hen a court sentences [an offender]... for a sex offense committed after July 1, 1988, but before July 1, 1990, ... the court shall ... sentence the offender to a one-year term of community placement beginning either upon completion of the term of confinement ..."[13]
In State v. Barnett, the supreme court considered the community supervision sentence of a defendant convicted of armed first degree robbery.[14] The statute permitted community supervision for certain convictions constituting "crimes against persons." The court determined that on the facts in Barnett, the crime was not one covered by the community placement statute. Therefore, the trial court exceeded its authority when it imposed community placement. The court invalidated the community placement portion of the sentence on the ground that "[a] trial court may only impose a sentence which is authorized by statute."[15]
The defendant in In re Carle pleaded guilty to first degree armed robbery, and his sentence included a deadly weapon enhancement.[16] Subsequent to the defendant's sentencing, the supreme court held in another case that the deadly weapon enhancement was not applicable in the same circumstances. The court found the enhanced sentence exceeded the maximum allowed under the statute, holding "[w]hen a sentence has been imposed for which there is no authority in law, the trial court has the power and duty to correct the erroneous sentence, when the error is discovered."[17]
In Matter of Moore,[18] the petitioner had been sentenced, pursuant to a plea bargain, to life without the possibility of parole for first degree aggravated murder.[19] The supreme court held the maximum sentence allowed by statute was life with the possibility of parole, and that the petitioner was entitled to relief because the sentence imposed was in excess of statutory authority. The court remanded for resentencing, noting that "a defendant cannot agree to be punished more than the Legislature has allowed for."[20]
The State maintains that State v. McFarland[21] controls the analysis. In McFarland, *1042 the defendant was tried, without counsel, in municipal court and sentenced to jail. Reporting to jail he was subjected to a routine booking search that uncovered illegal drugs. He was then prosecuted and convicted on a drug possession charge. On appeal, the supreme court assumed the municipal court conviction was void, because McFarland had been denied his constitutional right to counsel, but nevertheless found the search valid. While McFarland analyzed the effect of a void sentence on the subsequent search under the federal constitution, applying reasoning similar to the Fourth Amendment good faith exception, neither the majority nor the dissent mentions article 1, section 7. Therefore, McFarland is not helpful in a state constitutional analysis.
The State further argues that because correctional authorities have no power to modify criminal sentences and are required to enforce them, those sentences provide the authority of law for enforcement actions. The State relies on In re Chapman where a sentencing court entered judgment providing the sentence would be concurrent to a previous sentence.[22] Believing the court lacked authority to do this, the parole board ran the sentences consecutively.[23] The supreme court criticized the board for defying what was in fact a valid order.[24] The legislature subsequently provided procedures for the DOC to challenge sentences it believed were erroneous to prevent it from being in the position of "disregarding the judgment or enforcing what the department believes to be an erroneous sentence."[25]
Neither Chapman, nor the other cases the State cites to support this argument, are on point. In Chapman, the supreme court strongly chastised the DOC for refusing to enforce a valid court order. A crucial distinction between Chapman and this case is that, unlike the Chapman order, the order extending Wallin's community placement was not, in fact, valid. Moreover, to say that the DOC has no choice but to enforce valid orders tells us nothing about the actual authority the DOC possesses in enforcing invalid orders.
This case makes it quite clear that the DOC officers searching Wallin's computer reasonably believed they had the authority to do so. The judge who entered the order, the prosecuting attorney, the defense counsel, the DOC officer present at the hearing, and even Wallin himself, believed the order to be valid when it was entered. There is no suggestion that anyone believed the order to be invalid at any time before Wallin first raised the issue in his suppression motion. The police, when contacted were, in fact, conscientious in obtaining warrants for subsequent searches. There is no suggestion in the record that either the DOC officers or the police took a single misstep, nor that they acted in anything but good faith. But article 1, section 7, as currently read by our state supreme court, demands more than belief, and indeed more than good faith. It demands existing authority of law, and none existed here.
In In re Hilborn,[26] another case cited by the State, the court held that the DOC lacked standing to challenge the defendant's suspended sentence because it did not comply with the procedural requirements for seeking such a review under former RCW 9.94A.210(7). The court noted that since the statute exists for the benefit of the DOC and departs from traditional principles in permitting the DOC to seek review when the prosecutor has chosen not to, the statutory requirements are strictly observed.[27] Beyond that, the court specifically declined to consider whether the DOC was estopped from arguing the illegality of a sentence a DOC officer had recommended. The court also declined to reach the issue of whether the *1043 sentence itself was illegal.[28] That case is not helpful to our analysis here.
Finally, the State relies on In re Chatman. In that case, the trial court found the defendant, who was convicted of two counts of burglary, to be chemically dependent. As a result, the court suspended a portion of the sentence, and imposed community placement dependent on his participation in an in-patient drug rehabilitation program.[29] A DOC records manager informed the judge that the court had no authority to suspend a portion of an inmate's sentence, but the judge refused to correct the sentence unless directed to do so by an appellate court. The DOC challenged the sentence under RCW 9.94A.210. The court of appeals determined the judge did indeed lack statutory authority; the court also found that the DOC had complied with the statute by exhausting all attempts to resolve the dispute at the trial court level before seeking appellate review.[30] Accordingly, the court remanded the case for resentencing. The focus of the court was, as in Hilborn, on whether the DOC had complied with the statute's procedural requirements in challenging an invalid sentence.[31] Neither Chapman, Hilborn nor Chatman deals with the question of what constitutes authority of law for the purposes of article 1, section 7, and they cannot be read to confer such authority on an illegal sentence.
Finally, the State maintains that Wallin had no legitimate expectation of privacy in the face of an "apparently valid court order, which he had never challenged, and which was entered with the approval of his attorney."[32] The trial court similarly reasoned that "[s]upervision may have been improperly extended. However, the defendant invited the ruling, never challenged it, and never appealed its validity."[33] The record does not clearly indicate that Wallin either requested or agreed to the order extending community placement. Even assuming he did, a defendant's agreement, even as part of a plea bargain agreement, will not save an otherwise illegal sentence.[34] Similar "invited error" reasoning has been rejected by the supreme court on the ground that "a defendant cannot empower a sentencing court to exceed its statutory authorization."[35]
The court lacked statutory authority to extend Wallin's community placement. When his term expired in April 1999, he was no longer a probationer with a lessened expectation of privacy. The 1999 order was invalid. The initial search made pursuant to the order but without a warrant violated article 1, section 7 of the Washington State Constitution.

SUPPRESSION
Wallin claims that, under the rule announced in State v. White,[36] an article I, section 7 violation requires suppression of the evidence obtained as a result of the unconstitutionality.[37] Two years after White, in State v. Boland, the supreme court said:
In State v. White, ... we expressed the mandatory nature of the exclusionary rule in cases where a person's privacy rights under Const. art. 1, § 7 have been violated: We think the language of our state constitutional provision constitutes a mandate that the right of privacy shall not be diminished *1044 by the judicial gloss of a selectively applied exclusionary remedy. In other words, the emphasis is on protecting personal rights rather than on curbing governmental actions ... The important place of the right to privacy in Const. art. 1, § 7 seems to us to require that whenever the right is unreasonably violated, the remedy must follow.[[38]]
Again, citing White, the court has held that "[w]hen an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed. Under article I, section 7, suppression is constitutionally required."[39]
In the light of more recent precedent, the absolute exclusionary rule announced by White cannot be characterized as dicta. Nor is the rule limited to the facts of that case. White requires that, when an unreasonable violation of article 1, section 7 is found, the evidence uncovered as a result of the violation must be suppressed. Wallin's privacy was unreasonably violated in this case because there was no authority of law for the order extending his community placement. Thus, the evidence must be suppressed.
Nonetheless, the State urges us to adopt the reasoning of the California Court of Appeals in People v. Fields.[40] In that case, the California court refused to apply the exclusionary rule to a search conducted while the defendant was on probation for a drug conviction. The drug conviction was later reversed and the court held that admissibility of evidence should be determined by the probationer's status at the time of the search since under the facts exclusion served no valid deterrent function.[41] This analysis is similar to the reasoning of McFarland, which in essence applied the Fourth Amendment good faith exception. Like McFarland, Fields is simply not helpful in determining admissibility under our state constitution, particularly because deterrence is not the primary goal of our state's exclusionary rule.

GOOD FAITH EXCEPTION
The State argues that even if the warrantless search was illegal, we should adopt a good faith exception to the exclusionary rule. Wallin argues that no good faith exception can apply in this case.
As a general rule, warrantless searches are per se unreasonable.[42] Warrantless searches and seizures may, however, be reasonable under "a few `jealously and carefully drawn' exceptions[.]"[43] The State bears the burden of showing that a warrantless search falls under an established exception.[44]
The primary purpose of the Fourth Amendment's exclusionary rule is the deterrence of official misconduct.[45] Therefore, an exception exists where police reasonably and in good faith rely on a warrant later deemed invalid.[46] Good faith reliance must still be objectively reasonable under the Fourth Amendment. The question is whether a "reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." [47]
While the Washington Supreme Court has clearly rejected a good faith exception to the exclusionary rule under our state constitution in White and we are bound to follow that controlling precedent, the facts of this case illustrate the need for such an exception.[48] *1045 Characterizing the application of the good faith exception in the Fourth Amendment context as a "remedial measure for violations," the state supreme court said:
As a remedial measure, evidence is excluded only when the purposes of the exclusionary rule can be served. This approach permits the exclusionary remedy to be completely severed from the right to be free from unreasonable governmental intrusions. Const. art. 1, sec. 7 differs from this interpretation of the Fourth Amendment in that it clearly recognizes an individuals right to privacy with no express limitations.[[49]]
Under a state constitutional analysis, White rejected the good faith exception interpreting article 1, section 7 to mandate a right to privacy that shall not be diminished by the gloss of a selectively applied exclusionary remedy. It is for the supreme court to decide whether it should re-examine the exclusionary rule in light of the facts of this case.
Regardless of the federal constitutional analysis, no good faith exception currently applies to the article 1, section 7 analysis.[50] As a result, in the absence of an exception, "[w]henever the right [under article 1, section 7] is unreasonably violated, the [exclusionary] remedy must follow." [51]

PRIOR CONVICTIONS
Wallin challenges the life sentence imposed upon him as a persistent offender. He argues that the State was constitutionally required to charge Wallin's prior conviction in the information. Because we have decided this case based on article 1, section 7, we need not reach this issue.
We hold that the warrantless search by DOC officers of Wallin's apartment was without authority of law and violated article 1, section 7 of the Washington Constitution. Because the state exclusionary rule is not subject to a good faith exception, the evidence obtained as a result of the initial search should have been suppressed at trial.
We reverse the judgment and sentence.
WE CONCUR: SCHINDLER, and COLEMAN, JJ.
NOTES
[1] At the time Wallin committed the offense, first degree child molestation was a Class B felony. Effective July 1990, the crime was reclassified as a Class A felony. Laws of 1990, ch. 3, sec. 902.
[2] State v. Carter, 151 Wash.2d 118, 125-26, 85 P.3d 887 (2004) (citations omitted).
[3] Carter, 151 Wash.2d at 125, 85 P.3d 887. See also State v. Young, 123 Wash.2d 173, 179-80, 867 P.2d 593 (1994) (conducting the [State v.] Gunwall [106 Wash.2d 54, 720 P.2d 808 (Wash.1986)] analysis to show that article 1, section 7 is more protective than the Fourth Amendment).
[4] Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); State v. Ferrier, 136 Wash.2d 103, 111, 960 P.2d 927 (1998).
[5] State v. Duncan, 146 Wash.2d 166, 171, 43 P.3d 513 (2002) (citing State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999)).
[6] In re Maxfield, 133 Wash.2d 332, 339-42, 945 P.2d 196 (1997).
[7] State v. Boland, 115 Wash.2d 571, 577, 800 P.2d 1112 (1990).
[8] State v. Myrick, 102 Wash.2d 506, 510, 688 P.2d 151 (1984) (citing State v. Simpson, 95 Wash.2d 170, 178, 622 P.2d 1199 (1980)).
[9] Carter, 151 Wash.2d at 126, 85 P.3d 887.
[10] Griffin v. Wisconsin, 483 U.S. 868, 876-878, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (finding constitutional the warrantless search of a probationer's home pursuant to a probationary scheme that itself satisfied the Fourth Amendment); State v. Lucas, 56 Wash.App. 236, 244, 783 P.2d 121 (1989) (under the Fourth Amendment and article 1, section 7, probationers and parolees have a diminished right of privacy permitting a warrantless search if reasonable).
[11] RCW 9.94A.120(10)(a) (1998).
[12] RCW 9.94A.120(10)(c) (1998) (emphasis added).
[13] RCW 9.94A.120(9)(a) (1998) (emphasis added). The State concedes that the defendant is most likely correct that this statute could not be applied to crimes committed before 1996.
[14] State v. Barnett, 139 Wash.2d 462, 987 P.2d 626 (1999).
[15] Barnett, 139 Wash.2d at 464, 987 P.2d 626.
[16] 93 Wash.2d 31, 604 P.2d 1293 (1980).
[17] Carle, 93 Wash.2d at 33, 604 P.2d 1293. See also In re Stoudmire, 141 Wash.2d 342, 354, 5 P.3d 1240 (2000) (determining that a sentence in excess of statutory authority is a "fundamental defect" that permits a collateral attack on sentences in a PRP).
[18] 116 Wash.2d 30, 803 P.2d 300 (1991).
[19] Moore, 116 Wash.2d at 32, 803 P.2d 300.
[20] Moore, 116 Wash.2d at 38, 803 P.2d 300.
[21] 84 Wash.2d 391, 526 P.2d 361 (1974), cert. denied, 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975).
[22] In the Matter of Chapman, 105 Wash.2d 211, 213, 713 P.2d 106 (1986).
[23] Chapman, 105 Wash.2d at 213, 713 P.2d 106.
[24] Chapman, 105 Wash.2d at 216, 713 P.2d 106.
[25] In re Chatman, 59 Wash.App. 258, 264, 796 P.2d 755 (1990).
[26] 63 Wash.App. 102, 816 P.2d 1247 (1991), review denied, 118 Wash.2d 1013, 824 P.2d 491 (1992).
[27] Hilborn, 63 Wash.App. at 104, 816 P.2d 1247.
[28] Hilborn, 63 Wash.App. at 106, 816 P.2d 1247.
[29] Chatman, 59 Wash.App. at 259, 796 P.2d 755.
[30] Chatman, 59 Wash.App. at 264-65, 796 P.2d 755.
[31] Chatman, 59 Wash.App. at 265, 796 P.2d 755.
[32] (Emphasis added.)
[33] Clerk's Papers at 54. Conclusions of Law 8. The trial court found the court order facially valid, relying on the reasoning in McFarland, and characterizing Mr. Wallin's attack on the 1999 order as a collateral attack on the sentence.
[34] Goodwin, 146 Wash.2d at 869, 50 P.3d 618. See also In re Gardner, 94 Wash.2d 504, 617 P.2d 1001 (1980) ("A plea bargaining agreement cannot exceed the statutory authority given to the courts.").
[35] Goodwin, 146 Wash.2d at 870, 50 P.3d 618. See also Matter of Moore, 116 Wash.2d at 38, 803 P.2d 300.
[36] 97 Wash.2d 92, 640 P.2d 1061 (1982).
[37] Young, 123 Wash.2d at 196, 867 P.2d 593; Boland, 115 Wash.2d at 582, 800 P.2d 1112; White, 97 Wash.2d at 108-12, 640 P.2d 1061.
[38] Boland, 115 Wash.2d at 582, 800 P.2d 1112.
[39] State v. Ladson, 138 Wash.2d 343, 359, 979 P.2d 833 (1999). See also State v. Kennedy, 107 Wash.2d 1, 4, 726 P.2d 445 (1986).
[40] 119 Cal.App.3d 386, 174 Cal.Rptr. 49 (1981).
[41] Fields, 119 Cal.App.3d at 390, 174 Cal.Rptr. 49.
[42] State v. Hendrickson, 129 Wash.2d 61, 70, 917 P.2d 563 (1996).
[43] Ladson, 138 Wash.2d at 349, 979 P.2d 833.
[44] State v. Johnson, 128 Wash.2d 431, 451, 909 P.2d 293 (1996).
[45] United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).
[46] United States v. Leon, 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
[47] Leon, 468 U.S. at 922, n. 23, 104 S.Ct. 3405.
[48] In White, the supreme court noted that in its view even under a federal constitutional analysis, "[t]he good faith arrest exception is unworkable and is contrary to well-established Fourth Amendment principles." White, 97 Wash.2d at 106, 640 P.2d 1061.
[49] White, 97 Wash.2d at 109-10, 640 P.2d 1061.
[50] See State v. Crawley, 61 Wash.App. 29, 35, 808 P.2d 773 (1991) (Division 3 noted that "[t]he Washington Supreme Court has not adopted the [good faith exception] announced in Leon.").
[51] White, 97 Wash.2d at 110, 640 P.2d 1061.